**CHARLES PFIZER & CO., Inc.,
Petitioner,**

**v.**

**FEDERAL TRADE COMMISSION,
Respondent.**

**AMERICAN CYANAMID COMPANY,
Petitioner,**

**v.**

**FEDERAL TRADE COMMISSION,
Respondent.**

**Nos. 18336, 18337.**

United States Court of Appeals
Sixth Circuit.

Sept. 30, 1968.

Arthur G. Connolly, Wilmington, Del., for Chas. Pfizer & Co., Inc., Connolly, Bove & Lodge, Wilmington, Del., John E. F. Wood, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, Frost & Jacobs, Cincinnati, Ohio, on the brief, Thomas S. Lodge, Arthur G. Connolly, Jr., F. L. Peter Stone, Wilmington, Del., of counsel.

Richard Y. Holcomb, New York City, for American Cyanamid Co., Ralstone, R. Irvine, Roy W. McDonald, Kenneth N. Hart, Donovan, Leisure, Newton & Irvine, New York City, on the brief, Thomas S. Calder, Dinsmore, Shohl, Barrett, Coates & Deupree, Cincinnati, Ohio, of counsel.

Frederick H. Mayer, Federal Trade Commission, Washington, D. C., James McI. Henderson, Gen. Counsel, J. B. Truly, Asst. Gen. Counsel, Jerold D. Cummins, Atty., Federal Trade Commission, Washington, D. C., on the brief, for respondent.

Before O'SULLIVAN, PHILLIPS and CELEBREZZE, Circuit Judges.

PHILLIPS, Circuit Judge.

These consolidated cases involving the "wonder drug" tetracycline are before this Court a second time. In our earlier opinion, reported at 363 F.2d 757, this Court vacated the decision and order of the Commission and remanded the entire proceeding for a de novo hearing without the participation of the Chairman, who was held to be disqualified to sit in this case. Upon remand we directed that the Commission consider any evidence previously taken and additional admissible and relevant evidence on any issues raised by the complaint. Any party was authorized to require the presence of any previously sworn witness for additional testimony either on direct or cross-examination.

## Issues Previously Decided by this Court

For the assistance of the Commission on remand this Court passed upon two additional questions which were presented by the petitions for review at the former hearing:

(a) That, assuming the facts as found by the Commission to be supported by substantial evidence, the Commission had jurisdiction to require as a remedy the compulsory licensing of the tetracycline and aureomycin patents on a reasonable royalty basis; and

(b) That the record considered as a whole did not contain substantial evidence to support the decision of the Commission that the tetracycline patent was issued as a result of misrepresentations to the Patent Office and improper conduct on the part of Pfizer and Cyanamid.

In our former opinion this Court reached no decision on the issue of whether the petitioners fixed and maintained the price of tetracycline in substantial markets through a price fixing conspiracy.

## Proceedings on Remand

Upon remand the Commission reopened the proceeding and remanded it to the "Chief Hearing Examiner for an assignment to an examiner to begin expeditious hearings." The remand proceeding was assigned to Hearing Examiner Abner E. Lipscomb.[1]

In its remand order the Commission specified that it was for the sole and limited purpose of receiving the testimony of Patent Examiner H. J. Lidoff[2] and of any other witness who had testified previously, with respect to "the issue as to whether Pfizer and Cyanamid made misrepresentations to the Patent Office and withheld essential information, thereby deceiving Lidoff into grant-

ing a patent which otherwise never would have been approved."

In addition to the testimony of Examiner Lidoff, two witnesses for Pfizer testified at the new hearing. In his decision on remand the Hearing Examiner found that representatives of both Pfizer and Cyanamid made false and misleading statements to officials of the Patent Office and suppressed and withheld information, all of which were relevant and material to the consideration of the application by the officials of the Patent Office for a patent on tetracycline. Therefore, said the Hearing Examiner, officials of the Patent Office were misled into granting a patent on tetracycline which otherwise never would have been issued. The Hearing Examiner concluded that the acts and practices of Pfizer and Cyanamid constituted unfair methods of competition in commerce within the intent and meaning of the Federal Trade Commission Act.

With the Chairman not participating, the Commission adopted the findings and conclusions contained in the decision of Hearing Examiner Lipscomb as supplemented by its own opinion.[3]

The price-fixing aspect of the case is no longer before this Court. By an equally divided vote of two to two the Commission dismissed that portion of the complaint charging respondents with fixing and maintaining the price of tetracycline through a price-fixing conspiracy.

The Commission entered a final order on September 29, 1967, pertinent parts of which are set forth as Appendix A to this opinion. This order requires that Pfizer grant to any domestic applicant making written request therefor a non-exclusive, non-discriminatory license to make, use and sell tetracycline under all claims of Patent 2,699,054 (Conover

---

1. Robert L. Piper, the hearing examiner who originally heard the case and wrote the initial decision, was no longer in the employ of the Commission.

2. Lidoff did not testify at the previous hearing.

3. The Commission also readopted findings 1 through 18 and 27 through 29 contained in its Findings as to the Facts and Conclusions of Law issued August 8, 1963, and Part II of its opinion accompanying the final order issued December 17, 1963.

patent); and that Cyanamid likewise grant a license under Patent 2,609,329 (Niedercorn "improved" patent for aureomycin).[4] The order provides for collection of royalties of two and one-half per cent under both patents.

## Present Issue

The issue now before this Court is whether the findings of fact of the Commission are supported by substantial evidence. We answer this question in the affirmative and affirm and enforce the order of the Commission.

Much of the previous uncertainty in the record is eliminated by the testimony of H. J. Lidoff, the Patent Examiner who handled the Pfizer Conover application which ultimately resulted in the issuance of the tetracycline patent. At the time of the application Lidoff was an Assistant Examiner. Prior to the time when he testified as a witness, he had been promoted to membership on the Board of Patent Appeals. He is a career employee, having served with the Patent Office continuously since 1937.

Lidoff's testimony contradicts the inferences and findings of fact of Hearing Examiner Robert L. Piper in his initial decision and supports the initial findings of the Commission as well as the findings on remand.

The factual issues are discussed in some detail in the former opinion of this Court, 363 F.2d 757. The basic question is whether Pfizer and Cyanamid made misrepresentations to Lidoff and withheld essential information from him, thereby deceiving him into granting a patent on tetracycline which otherwise would never have been approved. The testimony of Lidoff, together with the Patent Office records, substantially support the affirmative findings of the Commission to this effect.

## Posture of Pfizer and Cyanamid to Obtain a Monopoly on Tetracycline

As pointed out in our earlier opinion, tetracycline has been described as "currently the best selling wonder drug in the United States." The complaint in this proceeding stated that the antibiotics industry is one of dynamic growth, with sales exceeding $330 million per year, and that tetracycline enjoys the largest sale by dollar volume, aggregating more than $100 million in 1957.

At the time the application for a patent on tetracycline was pending before the Patent Office, Pfizer and Cyanamid were in a posture to establish a monopoly in the production and sale of this drug which is of vital and unique importance in the treatment and cure of many diseases and of considerable impact upon the public health.

Penicillin was never patented. Nobody obtained a monopoly on it. Its production and sale proved to be fiercely competitive and profits were marginal.[5]

On September 13, 1949, Cyanamid obtained its patent on aureomycin (Duggar patent No. 2,482,055). On September 2, 1952, Cyanamid obtained an improvement patent on the Duggar process for producing aureomycin (Niedercorn patent No. 2,609,329). On July 19, 1950, Pfizer obtained a patent on terramycin (Sobin patent No. 2,516,080). As a result of these patents, Cyanamid and Pfizer have had a legal monopoly on the production and sale of aureomycin and terramycin, respectively.

On October 23, 1952, Pfizer filed its Conover application for a patent on tetracycline. This was followed on March 16, 1953, by Cyanamid's Boothe-Morton application for a patent on tetracycline. On October 29, 1953, Lidoff declared an interference for the purpose of determin-

---

4. Cyanamid's earlier aureomycin Patent 2,482,055 (Duggar) expired in 1966.

5. Cyanamid's attorney stated in a written memorandum to Lidoff in 1954, during the second interference proceeding,

that Cyanamid would rather pay royalties on tetracycline to a bona fide patentee than see the pharmaceutical business in which it has a major interest ruined by irresponsible price cutting.

ing priority of invention between these two applications.

In the meantime Heyden Chemical Company filed its Minieri application for a patent on tetracycline. On November 4, 1953, Cyanamid made a contract to acquire the Antibiotic Division of Heyden, including the rights to the Minieri patent application.

Thereupon Pfizer and Cyanamid executed a cross-licensing agreement.[6] Under this agreement, and with Heyden's Minieri application now owned by Cyanamid, these two companies were assured of sharing a monopoly on tetracycline if the Patent Office could be persuaded to grant a patent to either of them. Cyanamid then conceded that Pfizer's Conover application had priority in time and withdrew its Boothe-Morton application. This resulted in termination of the first interference on February 9, 1954, and removal of one obstacle from the pathway to obtaining a patent.

Another obstacle was an application filed by Bristol-Myers Company for a patent on tetracycline. As a result of Bristol's application, Lidoff declared a second interference, which continued from March 2, 1954, until October 14, 1954. The proceedings during this interference, its subsequent dissolution and the events following dissolution leading up to the ultimate granting of the patent to Pfizer encompass the issues of fact now before this Court.

### Obligation of Parties in Patent Office Proceedings

■ The Patent Office, not having testing facilities of its own, must rely upon information furnished by applicants and their attorneys. Pfizer and Cyanamid, like all other applicants, stood before the Patent Office in a confidential relationship and owed the obligation of frank and truthful disclosure.

In Kingsland v. Dorsey, 338 U.S. 318, 319, 70 S.Ct. 123, 124, 94 L.Ed. 123, the Supreme Court quoted with approval the following:

"By reason of the nature of an application for patent the relationship of attorneys to the Patent Office requires the highest degree of candor and good faith. In its relation to applicants, the Office * * * must rely upon their integrity and deal with them in a spirit of trust and confidence * *."

In Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 818, 65 S.Ct. 993, 999, 89 L.Ed. 1381, the Court said:

"Those who have applications pending with the Patent Office or who are parties to Patent Office proceedings have an uncompromising duty to report to it all facts concerning possible fraud or inequitableness underlying the applications in issue. * * * Public interest demands that all facts relevant to such matters be submitted formally or informally to the Patent Office, which can then pass upon the sufficiency of the evidence. Only in this way can that agency act to safeguard the public in the first instance against fraudulent patent monopolies."

### Initial Rejection of Pfizer's Application

In its opinion on remand the Commission found that in its conduct before the Patent Office Pfizer failed to abide by the standards of absolute candor and utmost good faith to which applicants and their attorneys must adhere in procuring a patent. The Commission also found that Cyanamid aided Pfizer in its efforts to secure the patent by deliberately withholding information which it knew or should have known was relevant to the patentability of tetracycline. The Commission concluded that the withholding of information together with the cross-licensing agreement constituted an illegal attempt by Pfizer and Cyanamid to share in an unlawful monopoly which in the light of the subsequent exploitation of the tetracycline patent resulted in a combination in restraint of trade in vio-

6. Negotiations had begun in November 1953. The formal agreement was executed January 11, 1954.

lation of Section 5 of the Federal Trade Commission Act.

These misrepresentations and the withholding of information related to the question of fact which Lidoff considered to be determinative to the issue of patentability: that is, whether tetracycline is inherently produced under the processes of the two aureomycin patents.

In an earlier ruling on the Minieri application dated September 28, 1953, Lidoff said that "the production of tetracycline as well as varying amounts of aureomycin * * * would appear to be inherent in the process of Duggar. * * There is found no patentable invention in culturing Duggar's mutants under the same conditions and finding that tetracycline as well as [aureomycin] is produced."

On November 14, 1954, Lidoff dissolved the second interference, ruling that tetracycline is not patentable because it appeared to lack novelty. Because of the disclosures of the Minieri application Lidoff ruled that tetracycline is unpatentable because it is produced in the process of Cyanamid's Duggar and Niedercorn patents. His written ruling contained the following language:

> "Duggar and Niedercorn each produce an antibiotic, disclosed as 'Aureomycin' by a fermentation process employing *streptomyces aureofaciens* and mutants thereof. The antibiotic is identified as an antibiotic by assay against bacteria. It appears from the disclosure of Minieri et al (a party to interference No. 86,861 in an application available to all the parties) that tetracycline is *also* produced in such a fermentation process and that larger proportions thereof are produced when the amount of chloride in the fermentation medium is low. * * * Minieri et al clearly and specifically disclose that the microorganism used to

prepare *tetracycline* belongs to the Duggar et al U S 2,482,055 species." [7]

### Misrepresentations and Withholding of Pertinent Information by Pfizer

On November 29, 1954, Pfizer's patent representatives met with Lidoff at his office concerning the rejection of the application. A written summary of the interview was prepared by Pfizer's representatives and filed with the Patent Office.[8] Representation was made on behalf of Pfizer that there was no reasonable basis for Lidoff's speculation "as to the co-production of tetracycline in the prior art processes." The written summary recites that Lidoff felt that he was justified in relying upon the disclosure of Minieri "as giving rise to a rebuttable assumption of inherent production." Pfizer's representatives denied that any such prima facie assumption is justified and asserted that "the available evidence is overwhelming contrary to the Examiner's assumption." Pfizer also argued that Cyanamid, which had manufactured literally tons of aureomycin under its Duggar and Niedercorn patents, had failed to discover *any* tetracycline in its large-scale manufacture, although Cyanamid had devoted extensive research to the recovery, purification and properties of aureomycin. It was argued that the experience of Cyanamid "should conclusively refute the tenuous basis for the Examiner's unwarranted assumption." The summary further states that Lidoff adhered to his position that he would not withdraw his rejection unless the applicant would submit a showing overcoming his speculated basis for rejection.

Pfizer then embarked on a program to convince Lidoff that his finding of inherent coproduction was erroneous.

Pfizer's patent agent previously had issued memoranda to two Pfizer scientists on October 15, 1954, instructing them to conduct work on the question of

---

7. Lidoff's written ruling is quoted in part at 363 F.2d 775, n. 12. He said: "It has long been held that a purer form of an old product is not inventive."

8. The summary is quoted in part at 363 F.2d 775–776.

coproduction of tetracycline, informing them that the work was in connection with the prosecution of the patent application and that the results might be used in preparing affidavits to be filed with the Patent Office.

The Niedercorn patent on aureomycin contained forty-four samples or examples of media. Two broths were prepared by Pfizer scientists in accordance with the specification set forth in Example 1. These tests showed that approximately five per cent of the total antibiotic activity in the filtered broth consisted of tetracycline. The results of this test were never disclosed to Lidoff, although expert testimony established that tetracycline could have been recovered from Example 1 broths at the time of these tests in October 1954. The Hearing Examiner found that if Pfizer's representatives had disclosed to Lidoff in the conference on November 19, 1954, the results of the tests of Example No. 1, this would have confirmed Lidoff's conclusion of inherent coproduction and would have ended the matter. No further test would have been specified, and the patent would never have issued. Lidoff testified that if he had been furnished this information concerning Example 1, "I would not have allowed the patent."

Instead Pfizer's representatives suggested that tests be made to determine whether tetracycline could be recovered from Niedercorn Example 28. They did not disclose to Lidoff that earlier tests conducted by Pfizer scientists demonstrated Example 28 broths to be so poor in antibiotic potency that they revealed neither aureomycin nor tetracycline.

The written summary of the interview with Lidoff on November 19, 1954, prepared by Pfizer's representatives, states that Lidoff required evidence that fermentation broths produced "strictly in accordance with the Duggar and Niedercorn disclosures * * * do not contain recoverable amounts of tetracycline.

Pfizer conducted its tests on Example 28, which previous experience demonstrated contained no tetracycline, instead of Example No. 1, which produced approximately five per cent of recoverable tetracycline. Lidoff denied that he selected Example 28 and testified: "I was interested in the conditions most likely to produce tetracycline—period." The Hearing Examiner found that, in its tests on one of the two Example 28 specimens, Pfizer did not adhere strictly to the Duggar and Niedercorn disclosures. The Niedercorn patent states that "for maximum growth, it is necessary that the pH of the fermentation medium be controlled within rather narrow limits. Highly effective growths may be obtained within the range of about 5.0 to 8.0. Best results are obtained within the range of approximately 6.4 to 6.7." The Hearing Examiner emphasized that Pfizer's affidavit represented that the entire fermentation was conducted at a pH of 6.7, whereas the beginning fermentation in one of the examples had a pH at 8.1, and was adjusted downward to 7.1 six and one-half hours later.

Pfizer's representatives failed to disclose to Lidoff the deficiencies in the Example 28 fermentation. Instead the affidavit was drafted to show that the Niedercorn Example 28 test was conducted throughout at the best possible pH for antibiotic growth. The Hearing Examiner further found that notwithstanding the low potency of the Niedercorn Example 28 test broth, Pfizer's representatives misleadingly told Lidoff that this broth was "truly representative" of a Niedercorn Example.

Lidoff testified: "[N]ormally we would expect that the precise conditions of the example would be duplicated to present a proper comparison. Any deviation therefrom without being put in the record would not be a proper presentation of the case. * * *"

"[H]ad it been called to my attention that there was a difference in pH, I would automatically have pointed out that there was not a proper comparison —that comparisons to be proper must be duplicates. * * *"

"[A] test run at 8.1 would not in my opinion be properly representative of an example which in accordance with the specific disclosure of the Niedercorn patent obtained best results at a pH from 6.4 to 7."

Pfizer submitted affidavits to Lidoff, executed by two of its scientists, reporting unsuccessful efforts to recover tetracycline from Example 28 fermentation broths. Lidoff requested still more information in affidavit form as to the possibility of recovering tetracycline. On December 9, 1954, another interview was held between Pfizer's representative and Lidoff and a supplemental affidavit was filed stating: "[I]n fact there was no indication whatever of the presence of tetracycline."

In support of its Bogert application No. 423,247 for a process patent for separating antibiotics Pfizer's representative stated in a written document filed with the Patent Office May 4, 1955:

> "The Examiner points out that the reference treats the products of the Duggar process and he concludes that such products 'inherently contains tetracycline.' It is believed that the Patent Office is aware of the fact that this 'inherent' production of tetracycline by the Duggar process is not in fact true."

■ It is to be emphasized that at the time of these representations Lidoff was still groping for information. Pfizer already had established coproduction as a *fact* while to Lidoff this remained a matter of *speculation*. The Commission correctly held that it was the obligation of Pfizer to disclose the results of the Example 1 tests and the deficiencies and variations in the Example 28 tests. Under the circumstances Pfizer cannot disclaim this responsibility because Lidoff, who was never informed of the Example 1 tests, did not expressly require use of Example 1 instead of Example 28.

Convinced by Pfizer's representatives that tetracycline was not inherently co-produced in manufacturing aureomycin, Lidoff changed his decision and granted the patent.

■ We hold that there is substantial evidence to support the Commission's findings that Pfizer suppressed material information relative to the results of the Example 1 tests and to both the extremely low potencies of the Example 28 broth tests and the fact that during the initial stages of fermentation of one of the two tested broths the pH factor exceeded substantially the optimum range prescribed in the Niedercorn patent. We further hold that substantial evidence supports the Commission's conclusion that Pfizer made misrepresentations of material facts and withheld pertinent information, thereby obtaining a patent on tetracycline which otherwise never would have been issued.

### Withholding of Pertinent Information by Cyanamid

During a conference with Cyanamid's patent counsel on November 16, 1953, Lidoff inquired whether strains used by Cyanamid in making aureomycin might have produced tetracycline. The attorney replied that he did not know but would find out and advise Lidoff. Cyanamid's counsel made inquiry and reported to Lidoff that Cyanamid "can unequivocally state that there has not been any tetracycline produced by them, inadvertently or otherwise."

Early in 1954 Cyanamid scientists conducted tests on old samples of aureomycin and found evidence that tetracycline was present. Further tests by Cyanamid scientists confirmed the findings of the prior tests showing coproduction of tetracycline. The record supports the finding of the Hearing Examiner that Cyanamid knew during 1954 that aureomycin contained tetracycline; that analysis of aureomycin fermentation broths on January 20, 1954, showed tetracycline in five of the six samples tested; and that other tests by Cyana-

mid conclusively confirmed the presence of tetracycline in aureomycin.

■ On February 25, 1954, the Cyanamid Director of Mycology Research sent out a memorandum to five other Cyanamid scientific personnel and to patent counsel which contained information that the tests of some old samples of aureomycin which had been produced in 1948 showed that they contained one to six percent tetracycline. Cyanamid's patent counsel testified that he did not remember seeing this memorandum until just prior to the Commission hearings in 1959. The Commission found that "counsel had ready access" to the information. Written on the face of this memorandum, which Cyanamid produced from its files in 1958 pursuant to a Commission subpoena, were the words "All copies were ret'd and destroyed." Under the rule of candor and truthfulness required of applicants before the Patent Office, the contents of this memorandum, contradicting Cyanamid's previous representations, should have been revealed to Lidoff. The record is silent as to which Cyanamid official directed that all copies of this highly significant document be returned and destroyed. Accepting as correct the testimony of Cyanamid's patent counsel that he had no recollection of having seen it at that time, responsibility for suppressing the facts shifts to the unknown Cyanamid official who directed that all copies be recalled and destroyed. We agree with the Commission that Cyanamid cannot escape responsibility for these actions.

At no time while Pfizer's patent application was pending or during the interference proceedings did Cyanamid disclose to the Patent Office that its previous representations were erroneous and that tetracycline was present in aureomycin broths. Not until several months after the patent had been issued to Pfizer did Cyanamid advise the Patent Office that, according to "recently" performed tests, tetracycline was found to be coproduced in Duggar-type fermentations and to be present in aureomycin broths.

■ We agree with the Commission that, because of its strong economic interest in having Pfizer awarded a patent, the fruits of which Cyanamid would share under the cross-licensing agreement, Cyanamid was under the same duty as Pfizer to reveal to the Patent Office information which it had reason to know was material to Pfizer's application.

In summary, Lidoff had made specific inquiry of Cyanamid's patent representative in his effort to reach a correct decision as to the novelty of tetracycline. The patent attorney gave an unequivocal answer that no tetracycline was produced in Cyanamid's aureomycin commercial operations or in aureomycin broths. This reply was erroneous since tetracycline is and always has been present in aureomycin and is inherently produced in the Duggar and Neidercorn processes. We agree with the Hearing Examiner that "if Cyanamid's patent representative did not know the true facts, he was nevertheless under a duty to know them and under a duty to reveal the truth to the patent examiner."

The Hearing Examiner found that during the summer of 1954, while the second interference was in progress, Cyanamid's representative, in papers filed with the Patent Office, continued to deny any inherent production of tetracycline in aureomycin and that "Cyanamid's knowledge was exactly contrary to its Patent Office statements."

Lidoff testified that if Cyanamid had informed him during the second interference proceedings that aureomycin contained two to four per cent tetracycline, he would have used that as a basis for rejecting all applications claiming the compound tetracycline. He further testified positively that, if Cyanamid had disclosed to him this information, he would have refused to issue the patent and would have held that tetracycline was not novel and was unpatentable because (1) it was produced under the process of prior patents and (2) it was available to the public prior to the filing of Pfizer's application.

Questions Left Unanswered in Former Decision of Commission

Appendix G to our former opinion, 363 F.2d at 817–822, contains numerous examples of contrary inferences drawn from the same evidence by Hearing Examiner Piper in the initial decision and by the Commission in its findings of facts.

At page 363 F.2d 777 are set forth certain material questions which had not been clearly answered in the record then before the Court. Lidoff answered these questions specifically, supporting the Commission's original findings of fact and contradicting the findings of Hearing Examiner Piper in his initial decision.

Pertinent testimony by Lidoff on these questions is set forth in Appendix B to this opinion.

The opinion of the Commission summarizes Lidoff's testimony as follows:

"Lidoff testified in this connection that as of December 9, 1954, and prior thereto he did not know as a fact that any tetracycline was inherently produced in the Duggar and Niedercorn patent fermentations; that he had speculated on the basis of information contained in the Minieri application that some tetracycline was present in the fermentation broths made pursuant to the teachings of Duggar and Niedercorn; that if tetracycline was inherently produced by these prior art processes and could be identified in the broths he was of the opinion that it lacked novelty and could not be patented; that Hutz and Murphy had vigorously denied at the time that such coproduction occurred; and that the factual question that he was attempting to get answered was whether identifiable tetracycline was or was not present in the broths of the Duggar and Niedercorn patents. Above all, he testified that had he been told by Pfizer that 5% of the antibiotic content of a Niedercorn Example 1 broth was tetracycline he would never have allowed the patent. He further testi-

fied that if he had known that commercial Aureomycin contained tetracycline he would have also rejected the Conover application on a different and additional statutory ground."

Admissibility of Lidoff's Testimony

At the former hearing before this Court Pfizer's attorneys stated that Pfizer had urged that Examiner Lidoff be called as a witness by the Commission and had requested an opportunity to interview him, but that their request had been denied. Pfizer complained vigorously of the failure of the Commission to call Lidoff as a witness.

On remand Lidoff was called as a witness and testified at length both on direct and cross-examination. Pfizer now contends that the testimony of this witness is based upon his "reconstructed state of mind," is conjectural and irrelevant and does not constitute admissible evidence.

Lidoff admitted that he did not have an independent personal recollection of all details of his interviews with representatives of Pfizer and Cyanamid. However, his testimony is not based upon mere habit but is grounded upon written records, including documents prepared by him, combined with his familiarity with Patent Office practices, procedures and policies. His written initial rejection of Pfizer's application (see 363 F.2d at 775, n. 12) was more than a "past recollection recorded;" it constituted the very act of rejection. As the author of this document, he is the most authoritative interpreter of its content. We hold this testimony to be admissible. Wigmore on Evidence, §§ 98, 747.

The failure of Lidoff to recall details of interviews conducted by him eleven years earlier is a matter addressing itself to his credibility. Questions of credibility and testimonial weight are issues upon which the courts do not second-guess the Hearing Examiner and the Commission. Niresk In-

dustries Inc. v. Federal Trade Commission, 278 F.2d 337, 341 (7th Cir.), cert. denied, 364 U.S. 883, 81 S.Ct. 173, 5 L. Ed.2d 104. The Hearing Examiner, who observed the demeanor of Lidoff while he was testifying, credited his testimony and commented as follows: "Moreover, it has been our observation that the witness who remembers too well and too clearly may be less credible than the witness who has difficulty in remembering." The Hearing Examiner further said:

"Mr. Lidoff's testimony, which was presented clearly and unequivocally, explains the numerous factual problems that confronted both the Commission and the Court in their evaluations of the original record; and it supplements and explains clearly proven facts in the record. These facts, combined with Mr. Lidoff's testimony, present clear, convincing and substantial evidence to support and sustain the facts herein found."

Other Contentions of Petitioners

Pfizer continues to assert that Lidoff was interested only in "appreciable" and "recoverable" amounts of tetracycline. Lidoff testified that "[t]he proportion or amount was not significant. The presence was the important thing." As stated by the Hearing Examiner:

"In fact, the presence of identifiable tetracycline in the fermentation broths produced pursuant to the prior Duggar and Niedercorn patents ' * * * was the crux of the whole issue.' Further, Patent Examiner Lidoff made it clear that it was not necessary for a therapeutic product to be coproduced, or for sufficient tetracycline to be present to give tetracycline activity to the mixture, or for commercial amounts of tetracycline to be coproduced. It was only necessary that there be sufficient tetracycline to be identified."

His testimony on this point is supported by his written action of November 24, 1954 (quoted at 363 F.2d 775, n. 12). Pfizer's contention is based upon its interpretation of words written by its own attorneys in the summary of their interview with Lidoff. The Commission adopted a contrary interpretation of these words, and we find this conclusion to be both reasonable and supported by substantial evidence.

Pfizer further contends that, even if Lidoff was interested in less than "appreciable" or "recoverable" amounts of tetracycline in aureomycin broths, he failed to convey his thoughts to Pfizer's representatives and they were not guilty of any misrepresentations. We hold that substantial evidence supports the Commission's conclusion that the Patent Office records were sufficient to put both Pfizer and Cyanamid's representatives on notice that Lidoff was interested in ascertaining whether any tetracycline was inherently produced in the aureomycin broths, and not ten per cent or other "appreciable" or "recoverable" amounts as now contended.

In any event, under the standards of candor and trust required of applicants before the Patent Office, it was the obligation of both Pfizer and Cyanamid to make a full disclosure, even though they understood Lidoff to be interested only in "appreciable" or "recoverable" percentages.

Pfizer contends that substantial evidence is not the correct yardstick required to sustain the order of the Commission but that the proper standard of proof to support a finding of misrepresentation is "clear, unequivocal and convincing" evidence as in cases of fraud. On the record before us, we could conclude that the Commission's findings of misrepresentation and withholding of material information on the part of both Pfizer and Cyanamid are supported by clear, unequivocal and convincing evidence. In our former opinion, however, this Court held that substantial evidence was the correct standard to be applied in reviewing this order of the Commission. We adhere to that view.

Another argument advanced by Pfizer is that Lidoff's interpretation of

patent law as to patentability of an unintentionally produced chemical compound is contrary to the controlling decisions. This is not the question before us. The Commission did not undertake to pass upon the validity of the patent, nor do we. The order of the Commission treats the patent as valid and requires compulsory licensing. The issue here is a violation of Section 5 of the Federal Trade Commission Act, not the validity of a patent. In our former opinion this Court held that, assuming the facts found by the Commission to be supported by substantial evidence, the Commission had jurisdiction to require as a remedy the compulsory licensing of the tetracycline and aureomycin patents on a reasonable royalty basis.

It is further argued by Pfizer that Lidoff vacillated on his views of patentability and therefore his testimony on the standard of patentability which guided him is not credible. To the contrary, the record shows that Lidoff's alleged changes of position were not due to changes in his concept of patent law but to changes in his understanding of the facts. His decision to grant the patent to Pfizer after having denied it initially was caused by the misrepresentations of facts and the withholding of pertinent information which have been discussed in detail in this opinion.

All the other contentions of petitioners have been considered and found to be without merit.

The order of the Commission is affirmed and enforced.

## APPENDIX A
### EXTRACTS FROM COMMISSION'S FINAL ORDER OF SEPTEMBER 29, 1967

IT IS FURTHER ORDERED that the findings and conclusions contained in the initial decision following remand be, and they hereby are, adopted as the findings and conclusions of the Commission as supplemented by (1) the accompanying opinion of the Commission, (2) findings 1 through 18 and 27 through 29 contained in the Commission's Findings as to the Facts and Conclusions of Law issued August 8, 1963, and (3) Part II of the Commission's Opinion accompanying the Final Order issued December 17, 1963.

IT IS FURTHER ORDERED that respondent Chas. Pfizer & Co., Inc., grant to any domestic applicant making written request therefor, a non-exclusive, non-discriminatory license to make, use, and sell tetracycline under all claims of United States Patent 2,699,054. Said licenses granted hereunder shall be for the full, unexpired term of said patent and shall contain no restriction or limitation, except that such licenses may contain provisions in a form customary in such patent licenses, allowing the licensor to collect royalties of not more than two and one-half (2½) percent of the net sales of tetracycline manufactured or sold under said licenses, providing for the inspection of books and records by independent auditors to determine the correctness of any royalty payment, and providing for the cancellation of the licenses at the option of the licensor upon failure of the licensee to permit such inspection or to pay royalties due and payable. Said licenses shall provide that in the case of the licensor granting or having granted more favorable terms to any other licensee, the licensee under said license shall be entitled to equal treatment; *Provided, however,* that respondent may require any such applicant to pay upon acceptance of a license an amount not exceeding $2,500 which shall be applied against future royalty payments.

IT IS FURTHER ORDERED that respondent American Cyanamid Company grant to any domestic applicant making written request therefor, a non-exclusive, non-discriminatory license under all claims of United States Patent 2,609,329. Said license granted hereunder shall be for the full, unexpired term of the patent licensed and shall contain no restriction or limitation on the licensee's right to make and sell tetracycline, except that such licenses may contain provisions, in

a form customary in such patent licenses, allowing the licensor to collect royalties of not more than two and one-half (2½) percent of the net sales of tetracycline manufactured under said licenses, providing for the inspection of books and records by independent auditors to determine the correctness of any royalty payment, and providing for the cancellation of the licenses at the option of the licensor upon failure of the licensee to permit such inspection or to pay royalties due and payable. Said licenses shall provide that in the case of the licensor granting or having granted more favorable terms to any other licensee, the licensee under said license shall be entitled to equal treatment; *Provided, however,* that respondent may require any such applicant to pay an amount not exceeding $2,500 which shall apply against future royalty payments under any patent or patents licensed hereunder.

IT IS FURTHER ORDERED that respondents Chas. Pfizer & Co., Inc., and American Cyanamid Company each refrain from making any assignment, sale, or other disposition of any of the patents required to be licensed hereunder which would deprive it of the power to issue licenses pursuant to this order unless said respondent requires as a condition of such disposition that the purchaser, assignee, or licensee shall observe the provisions of this order with respect to such patent and that the purchaser, assignee, or licensee file with the Commission a written undertaking to be bound by such provisions; *Provided, however,* that one or both of said respondents may dedicate any such patent, patents, or a general patent license to the general public in lieu of issuing licenses pursuant to the provision of this order.

IT IS FURTHER ORDERED that respondent American Cyanamid Company furnish to any person licensed under this order, and making written request therefor, whatever technical information and know-how that American Cyanamid Company has in the past furnished Chas. Pfizer & Co., Inc., relating to the manufacture and use of chlortetracycline, said technical information and know-how to include a furnishing of viable *S. aureofaciens* cultures that are identical to or equivalent to any cultures furnished Chas. Pfizer & Co., Inc. The information to be made available hereunder shall be made available without charge other than the expense to respondent of furnishing such information; *Provided, however,* that respondent American Cyanamid Company may require any such licensee to agree to keep said technical information and know-how confidential.

IT IS FURTHER ORDERED that respondent Chas. Pfizer & Co., Inc., furnish to any person licensed under United States Patent 2,699,054 pursuant to this order, and making written request therefor, whatever technical information and know-how that Chas. Pfizer & Co., Inc. has in the past furnished American Cyanamid Company relating to the manufacture of tetracycline by the dechlorination process. The information to be made available hereunder shall be made available without charge other than the expense to respondent of furnishing such information; *Provided, however,* that respondent Chas. Pfizer & Co., Inc., may require any such licensee to agree to keep said technical information and know-how confidential.

IT IS FURTHER ORDERED that respondents American Cyanamid Company and Chas. Pfizer & Co., Inc., shall within sixty (60) days after the effective date of this order file with the Commission a written description of the know-how and technical information required to be furnished under Paragraphs 6 and 7.

IT IS FURTHER ORDERED that that portion of the complaint charging respondents with fixing prices be, and it hereby is, dismissed.

IT IS FURTHER ORDERED that respondents American Cyanamid Company and Chas. Pfizer & Co., Inc., each shall file with the Commission within sixty (60) days after the effective date of this order, a report in writing under oath, signed by each respondent, setting

forth in detail the manner and form of its compliance with this order.

By the Commission, Chairman Dixon not participating; and Commissioner Jones dissenting from that portion of the order permitting respondents to collect royalties under the patents.

JOSEPH W. SHEA
JOSEPH W. SHEA,
Secretary.

## APPENDIX B

### EXCERPTS FROM TESTIMONY OF H. J. LIDOFF

Q. Now, Mr. Lidoff, the Sixth Circuit Court of Appeals, in remanding this proceeding to the Commission, propounded certain questions or inquiries, and I would like to take those up with you at this time, and there will be some repetition of what you have already stated.

Mr. Lidoff, I want to ask you if at the time the notice of allowance was issued in Pfizer's Conover application, and prior thereto, to what extent were you aware of inherent coproduction of tetracycline in aureomycin broths and in the finished product? A. I was not aware of such information, at least in any available form that could be applied in rejecting the application.

Q. The second question of the Court.

In handling applications, including Pfizer's Conover application, for a product patent on tetracycline, were you concerned only with co-production in aureomycin as a finished product, or was your inquiry also directed to co-production in aureomycin fermentation broths? A. Overall I was interested in the prior production in any manner of tetracycline, specifically in this interest the production of tetracycline in conjunction with aureomycin, in view of the references which dealt with, at least ostensibly dealt with the production of aureomycin.

Q. Was the Federal Trade Commission Hearing Examiner that handled this case initially correct or incorrect in his finding that if you had known that old aureomycin contained from two to five per cent tetracycline, you would nevertheless have granted the Pfizer tetracycline patent to Pfizer? A. Well, as pointed out before, while it would have been based on a different portion of the statute, I would not have allowed the Conover patent had I known that prior commercial aureomycin actually contained tetracycline, noting, of course, that this is a different rejection than the rejection that we have been discussing which I did make.

Q. Which you did what? A. Which I did make. That the rejection in the file is a different rejection than that which would have been raised had this been known as a fact.

Q. Next question of the Sixth Circuit Court of Appeals.

Did you consider any amount of coproduction of tetracycline in aureomycin under 10 per cent to be immaterial in your handling of the Pfizer application for patent on tetracycline? A. Well, that sentence is a little involved. No, I did not consider that production of any amount under 10 per cent to be immaterial because—

Q. Is that immaterial? A. Immaterial—because the production of any amount regardless of the numerical value would in my opinion have at that time properly supported the rejection. In other words, there is no numerical limitation to the amount of tetracycline produced. The important factor, in my mind, was was any tetracycline produced.

Q. Why did you request tests by Pfizer of Niedercorn Example 28, if you did, rather than requesting tests of other examples among the 44 listed in the Niedercorn patent—and this is the Court's question—at least one of which, Example 1, the Commission found would have disclosed 5 per cent co-production. A. This requires some generalization here.

First of all, a patent examiner does not require tests. A patent examiner makes a rejection and in order to overcome this rejection, an applicant may, if he desires, present so-called tests or

comparisons or any other data normally in affidavit form.

It is not the function of the patent examiner either to require tests or to point out specifically what tests should be made. Normally, however, a compromise has to be reached in view of the facilities available to the applicant for making the tests, and none are available to the patent examiner to check the tests. Normally a compromise is reached, and applicants present affidavits, present tests and comparisons, and based upon these an Examiner makes up his mind, realizing that they are not necessarily the best or the ultimate in comparisons and in testing.

It is a question of working out the best possible compromise.

Now, I will say further that an Examiner will, in discussion, attempt to select from tests presented to him, or from data presented to him, if so asked —will attempt to point out the more convincing evidence. However, the selection of the test is normally in the province of the applicant.

Q. Well, did you limit Pfizer to Example 28? A. Definitely no, I would not have. Now, remember, I don't recall precisely—I cannot. But I would not have limited testing to any example. I might have suggested that that looked the most promising, but I would not have limited the test to that example.

Q. Now, this is another question of the Sixth Circuit, and I will read it.

In your handling of the Pfizer Conover application for a patent on tetracycline, were you interested in establishing only that the prior art processes did or did not produce tetracycline in appreciable—and that is in quotes—amounts, making possible its prior recovery as a therapeutic product. A. First of all, I was not—I would not have been interested in recovering a therapeutic product. The claim was directed to a compound per se, not to a therapeutic product. So that my interest would have been identification of the material tetracycline as present.

However, we run into some semantics here—and I know we will further on, as to recovery of appreciable amounts and so forth—and I might summarize that my interest was in determining whether or not the material tetracycline was present.

However, at that time at least, most methods of identifying and determining the presence of this material would have in the broadest sense been encompassed by the word "recovery". You normally in order to identify something recover it to the extent of at least separating it from some of its impurities. So that while we are bandying words back and forth, the important factor in my view of patentability was that if any identifiable amount of the material were present, a valid patent could not issue, and regardless of what language we end up using, this is what I was after.

Q. I see.

Was the Federal Trade Commission Hearing Examiner correct in his conclusion that you knew "for more than a year prior to the decision on the second interference" that fermentation broths produced under Duggar and Niedercorn usually contain tetracycline, or was the Federal Trade Commission correct in its conclusion to the contrary? A. The answer is I did not know.

Q. Did you draw a distinction as to the significance of co-production as between product and process applications as found by the FTC Hearing Examiner, or was the Federal Trade Commission correct in reaching its contrary conclusion? A. Simply speaking, I did not make a distinction in my mind between the two. This will probably later demand some explanation as to these office actions dealing with fermentation processes and products. If you wish the explanation now, I can put it into the record.

Q. Well, when you say you did not draw a distinction between the two, you mean between the product application and the fermentation process application. A. Correct.

Q. Was the amount—rather, was the co-production of any tetracycline equally a factor in both these types of applications? A. No, not equally. In a product claim, the presence of the tetracycline was a determining issue. In a process claim, the process parameters were the important thing, and the product so produced of less significance. So there is a great distinction as to the weight to be given to this co-production.

Q. Is any—is the co-production of any tetracycline relevant to a product application? A. In my opinion, the production of any tetracycline is the most important factor in an application containing claims to the product tetracycline.

Q. The next question I have concerns the Taylor affidavit which you have earlier answered.

[Lidoff testified that he does not remember seeing Bristol's Taylor affidavit, which was filed six days before the patent was issued, but that "the odds are very greatly against my having seen it."]

The next question I will ask you is a question posed by the Sixth Circuit Court of Appeals as follows.

Would your decision to grant the Pfizer Conover patent have been different if Cyanamid had revealed that it was in error in its prior assurances that there was no co-production of tetracycline in aureomycin, or were you already aware of the fact that aureomycin contained tetracycline? A. A, I was not aware of the fact.

Q. I didn't get that answer. A. A—I was not aware of the fact that aureomycin actually contained tetracycline. And B, as I pointed out before, the availability of this knowledge, the form in which the knowledge was available, would have been the most important thing. That is to say, it has to be in a publication that could be used. The fact that Cyanamid may have admitted it in a record, in a Cyanamid application, would not have been of significance in the prosecution of the Conover application

once it was separated from the interference.

Q. Why? A. Because as I pointed out in the Patent Office information in one application, an application assigned to an assignee, cannot be employed to reject another application—an application of a different assignee. The basis for such rejections are normally publication.

Now, that would have to do with published matter.

Now, in addition to that, we have not separated from that particular question whether this information had to do with aureomycin produced in accordance with Duggar and Niedercorn, and that commercially available. That is, we had to split that also.

Q. Well, now, if Cyanamid had revealed during the second interference proceeding between Cyanamid, Pfizer and Bristol, that it was in error in its prior assurances, that there was no co-production in aureomycin, would your decision to grant the Pfizer Conover patent have been different? A. The answer is yes, and let's break it down into two parts.

If they had admitted during the interference that following Duggar or Niedercorn a broth would be produced which contained tetracycline, then I would have maintained the rejection which we did present based upon the Duggar and Niedercorn application.

If, on the other hand, the admission was that commercial aureomycin previously sold to the public had contained tetracycline, then the rejection would have been a different rejection based on a different section of the statute, but nevertheless would have prevented issuance of the patent.

Q. Does that include the Conover patent? A. Yes—it includes all of them. As long as they were in interference it would include any application then in that interference—because the information would then have been available to all parties, and they could have had a chance to rebut it ex parte.