498 F.Supp. 28 (1980)
In re COORDINATED PRETRIAL PROCEEDINGS IN ANTIBIOTIC ANTITRUST ACTIONS.
UNITED STATES of America
v.
PFIZER INC., American Cyanamid Co., Bristol-Myers Co., Olin Mathieson Chemical Corp., Squibb Beechnut, Inc., E. R. Squibb & Sons Inc., Upjohn Co.
Civ. A. Nos. 78-1155, 78-1156.
United States District Court, E. D. Pennsylvania.
August 18, 1980.
*29 Paul A. Owens and Edward S. Panek, U. S. Dept. of Justice, Antitrust Division, Philadelphia, Pa., for the United States of America.
Robert E. Cooper, Gibson, Dunn & Crutcher, Los Angeles, Cal., Joseph A. Tate, Philadelphia, Pa., for defendant Pfizer Inc.
Samuel W. Murphy, Jr., Donovan, Leisure, Newton & Irvine, New York City, F. Hastings Griffin, Jr., Dechert, Price & Rhoads, Philadelphia, Pa., for defendant, American Cyanamid Co.
Richard A. Horgan, Winthrop, Stimson, Putnam & Roberts, New York City, for defendant, Bristol-Myers Co.

MEMORANDUM OPINION AND ORDER
WEINER, District Judge.
This action was brought by the plaintiff, United States of America, on a three count complaint against the defendants, Pfizer Inc., American Cyanamid Company, Bristol-Myers Company, Olin Mathieson Chemical Co., Squibb Beechnut, Inc., E. R. Squibb & Sons, Inc., and Upjohn Company. Count I seeks cancellation of the Conover patent[1] on the broad spectrum antibiotic tetracycline, alleging that its issuance on January 11, 1955 was the result of a fraud perpetrated on the Patent Office by defendant Pfizer Inc. by intentionally making false and misleading statements to the Patent Office while suppressing and withholding material and relevant information. The government alleges that the Patent Office would not have issued the patent but for the fraudulent and deceitful conduct of Pfizer. Count II[2] is a common law action of deceit, alleging *30 that each of Pfizer, Cyanamid, and Bristol had separately committed fraud on the Patent Office but for which no patent would have issued on tetracycline. The government seeks to hold Pfizer, Cyanamid and Bristol jointly and severally liable for overcharges in excess of $203,000,000 sustained by the government on direct and federally financed purchases of broad spectrum antibiotics. Count III[3] is an antitrust civil damage action pursuant to Section 4A of the Clayton Act[4] against Pfizer, Cyanamid, Bristol, Squibb, and Upjohn, alleging that they conspired to monopolize and restrain trade in the manufacture and sale of broad spectrum antibiotics, in violation of the Sherman Act, and that the government, as a purchaser of drugs and as a financer or reimburser of purchases by others, was damaged in excess of $109,000,000, because prices were higher than they would have been in a freely competitive market. The parties agreed to reserve trial of Count III until the Court made its decision as to Count I. Count I of the case was tried to the Court without a jury.
The defendants have each filed an answer denying the material allegations of the complaint.
One of the earliest antibiotics[5] was penicillin which was first discovered about 1929, and further developed about ten years later. Penicillin is limited as to what organisms are affected by it. Its limited range of activity is good for inhibiting organisms called gram positive microorganisms, but it does not affect other bacteria which cause serious infections. It is called a narrow spectrum antibiotic because it is effective only against a relatively small number of organisms.
In contrast to the narrow spectrum antibiotic, there are broad spectrum antibiotics which have a wide range of attack on many different kinds of microorganisms.
The first broad spectrum antibiotic available to the public was chlortetracycline. It was discovered by Cyanamid scientist Dr. Duggar and introduced for sale on December 1, 1948 by Cyanamid under the brand name Aureomycin. The product Chlortetracycline, and the fermentation processes for its production were covered by the Duggar patent[6] which was issued to Cyanamid on September 13, 1949. On September 2, 1952, the Niedercorn patent[7] was issued to Cyanamid on improved fermentation processes. Aureomycin was a successful product until 1953 when its sales declined due to side effects problems attributable to the antibiotic.
Another broad spectrum antibiotic, oxytetracycline, was discovered by Pfizer scientist Dr. Sobin, and introduced by Pfizer in March 1950 under the brand name Terramycin. This drug was covered by the Sobin patent[8] issued to Pfizer in July 1950.
The next of the broad spectrums, tetracycline, was discovered by Pfizer's Dr. Conover in June 1952. He removed the Chlorine atom from chlortetracycline (Aureomycin) and replaced it with a hydrogen atom, a process called "dischlorination". On October 23, 1952 Pfizer filed Conover's application for a patent on tetracycline and the dischlorination process.
*31 Shortly thereafter, Cyanamid's scientists also discovered that tetracycline could be produced by dischlorination of Aureomycin. On March 16, 1953, Cyanamid filed its Boothe-Morton application for a patent on tetracycline and the dischlorination process. On October 19, 1953 Bristol filed its Heinemann application for a product and process patent on tetracycline. Because of the conflicting applications of Pfizer and Cyanamid, the Patent Office declared an "interference".[9] In November 1953, Pfizer and Cyanamid entered into an oral agreement, later formalized in writing on January 11, 1954, by which Cyanamid would license Pfizer under the Duggar and Niedercorn patents. They agreed to exchange proofs of priority on tetracycline, and that the party found not having priority, would concede priority to the other. The party who received the tetracycline patent would license the other. Cyanamid conceded priority to Pfizer in February 1954, and the interference proceeding between the competing applications was ended by the Patent Office.
On March 2, 1954, an interference was declared by the Patent Office involving Pfizer's Conover application, Cyanamid's Minieri application and Bristol's Heinemann application. On October 14, 1954, Examiner Lidoff dissolved the interference, ruling that tetracycline hydrochloride was not patentable to any parties to the interference because it appeared that tetracycline and tetracycline hydrochloride were inherently produced by the prior art fermentation processes described in the Duggar and Niedercorn patents. The patent was eventually issued to Pfizer in January 1955.
Prior to this, on November 16, 1953, Cyanamid marketed the first tetracycline under the brand name "Achromycin". The introductory price was identical with the prices of Aureomycin and Terramycin, other broad spectrum antibiotics then on the market.
On November 25, 1953 Cyanamid began shipping bulk tetracycline to Pfizer in accordance with the oral agreement entered into earlier that month. Beginning in January 1954, Pfizer marketed this bulk tetracycline under the trade name "Tetracyn". The price was identical with the prices of Cyanamid's Achromycin, and of the other broad spectrum antibiotics then on the market.
Bristol, meanwhile, was producing tetracycline through a direct fermentation process. On May 1, 1954 Bristol began to market this tetracycline under the trade name "Polycycline". The published price was identical to the market tetracycline prices of Cyanamid and Pfizer.
Bristol then began selling bulk tetracycline to Squibb and Upjohn. Squibb marketed tetracycline under the trade name "Steclin". Upjohn marketed tetracycline under the trade name "Panmycin". The published prices for these products were identical to those of the tetracycline products of Cyanamid, Pfizer and Bristol.
On the date the Conover patent for tetracycline was issued (January 11, 1955), Pfizer sued Bristol, Squibb and Upjohn for infringement of its Conover patent. Bristol, Squibb and Upjohn alleged as a defense that the Conover patent was invalid and unenforceable because of Pfizer's misconduct before the Patent Office. In December 1955, Bristol, Squibb and Upjohn dropped their challenge to the validity of the Conover patent. Bristol received a license to make, use and sell tetracycline while Squibb and Upjohn each received a license to use and sell tetracycline.
The government contends that Pfizer perpetrated a fraud on the Patent Office to obtain the patent on tetracycline. The government claims that Pfizer accomplished the fraud by concealing from Examiner Lidoff the fact that small amounts of tetracycline *32 were coproduced[10] during the preparation of the earlier antibiotic Aureomycin according to the prior art[11] Duggar and Niedercorn fermentation processes. The government claims that Lidoff would have rejected the Pfizer (Conover) patent application if any tiny amount of tetracycline was coproduced in the processes of the prior art, the Duggar and Niedercorn patents. The government further claims that Pfizer understood that fact and deliberately misled Lidoff into thinking that no tetracycline was coproduced in those processes. Another claim of the government is that by 1953 Cyanamid knew that tetracycline was present in samples of commercial Aureomycin, and it failed to bring this information to the attention of the Patent Office. A further government claim is that Bristol conducted experiments in late 1953 or early 1954 with the prior art Duggar and Niedercorn patents and found that tetracycline was inherently produced, and it failed to disclose this information to the patent examiner and made material misrepresentations of fact concerning it.
The complaint alleges that but for the separate frauds committed by Pfizer, Cyanamid and Bristol, the Conover patent would not have been issued. The complaint further alleges that Pfizer, Cyanamid and Bristol continuously utilized the fraudulently procured Conover patent to foreclose competition from the tetracycline and broad spectrum antibiotic market and that competition in the manufacture and sale of broad spectrum antibiotic products has consequently been substantially restricted and restrained.
On July 2, 1958 the Federal Trade Commission (FTC) filed a complaint naming, Pfizer, Cyanamid, Bristol, Squibb and Upjohn as respondents, alleging that Pfizer made false, misleading and incorrect statements to, and withheld material information from, the Patent Office to induce the issuance of a patent on tetracycline, and that Cyanamid and Bristol withheld material information from the Patent Office in the course of their patent applications, as the result of which Pfizer was aided and abetted in obtaining its tetracycline patent. On September 29, 1967, the FTC entered a final order that Pfizer and Cyanamid had misrepresented to, and withheld material information from, the Patent Office in the obtaining by Pfizer of the tetracycline patent. The order of the FTC was affirmed on September 30, 1968, by the United States Court of Appeals for the Sixth Circuit. Charles Pfizer & Co., Inc. v. Federal Trade Commission, 401 F.2d 574 (6th Cir. 1968). The Court of Appeals stated: "The Commission did not undertake to pass upon the validity of the [Conover] patent, nor do we." Id. at 586. On March 24, 1969 the United States Supreme Court denied certiorari (394 U.S. 920, 89 S.Ct. 1195, 22 L.Ed.2d 453).
On August 17, 1961, a grand jury in the Southern District of New York returned a three count indictment against Pfizer, Cyanamid and Bristol, charging a conspiracy in restraint of trade, a conspiracy to monopolize trade, and a monopoly of trade, in broad spectrum antibiotics. Squibb and Upjohn were named as co-conspirators. The indictment charged that the defendants, pursuant to a conspiracy, misled the Patent Office, used patents to exclude competitors, and fixed prices.[12] After trial, the jury returned a verdict of guilty as to each defendant on all three counts. On appeal, the Court of Appeals reversed the judgments of conviction. United States v. Chas. Pfizer & Co., Inc., et al., 426 F.2d 32 (2nd Cir. 1970), affirmed by the United States Supreme Court, 404 U.S. 548, 92 S.Ct. 731, 30 L.Ed.2d 721 (1972).
*33 This action was filed by the government on July 15, 1969, in the District of Columbia. The complaint contained the three counts set forth on the first page of this Opinion. On January 30, 1970, the Judicial Panel on Multidistrict Litigation transferred Counts II and III to the Southern District of New York for coordinated pretrial proceedings before Judge Miles Lord, specially assigned there. A motion to transfer Count I was denied. On July 20, 1971, Count I was transferred to the District of Minnesota, and on August 4, 1971, Counts II and III were also transferred to the District of Minnesota. The defendants moved for a jury trial which the Minnesota Court took under advisement. On three separate occasions, the government moved for and was granted a motion to amend its complaint.[13] The government filed its third amended complaint in October, 1975. Each defendant filed an answer with a demand for a jury trial. On August 16, 1976, the Court declared a mistrial.
On April 10, 1978, the case was then transferred from the Minnesota Court to this court for trial. The trial lasted approximately 45 days, and produced thousands of pages of testimony. Hundreds of exhibits were introduced at the trial as well as additional designated testimony and exhibits post trial by agreement of all counsel and the court.
Federal patent power is derived from the United States Constitution which provides that:
"The Congress shall have Power to promote the Progress of ... useful Arts, by securing for limited Times to ... Inventors the exclusive Right to their ... Discoveries."
Art. I, § 8, cl. 8.
Congress thereafter enacted the Patent Act of 1790, 1 Stat. 110. This Act was followed by the Act of February 21, 1793, c. 11, 1 Stat. 318; Act of July 4, 1836, c. 357, 5 Stat. 117; Act of July 8, 1870, c. 230, 16 Stat. 198; Rev.Stat. § 4886 (1874); and finally the 1952 Patent Act. The prerequisites of patentability dating back to the Patent Act of 1790 are novelty and utility. There can be no argument of novelty and utility of tetracycline since it has been to this date one of the most widely used broad spectrum antibiotics on the market, and it was not recognized prior to the Conover application.
The government, in Count I, seeks cancellation of the Conover patent alleging that its issuance was the result of fraud on the Patent Office. The government places great reliance on the fraud charge. The government charges that but for Pfizer's fraudulent conduct, the Conover patent would not have issued. The law is well settled that a suit to set aside a patent for fraud can only be sustained when the testimony in respect to the fraud is clear, unequivocal and convincing, and cannot be done upon a bare preponderance of the evidence which leaves the issue in doubt. U. S. v. American Bell Tel. Co., 167 U.S. 224, 251, 17 S.Ct. 809, 814, 42 L.Ed. 144 (1897). Those who have applications pending with the Patent Office have an uncompromising duty to report to it all facts concerning possible fraud or inequitableness underlying the application in issue. Precision Instrument Manufacturing Co. et al. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 818, 65 S.Ct. 993, 999, 89 L.Ed. 1381 (1945). The applicant for a patent stands before the Patent Office in a confidential relationship and owes an obligation of frank and truthful disclosure. The Patent Office must rely upon the information furnished by applicants since it has no testing facilities of its own. Charles Pfizer & Co., Inc. v. Federal Trade Commission, 401 F.2d 574, 579 (6th Cir. 1968).
To determine whether Pfizer obtained the Conover patent as a result of fraud on the Patent Office, we must examine the dealings of Dr. Francis X. Murphy and Mr. Werner Hutz, Pfizer's representatives, with Patent Examiner Lidoff in November and December 1954. Lidoff had rejected all claims to the product tetracycline in November 1954. Lidoff's reason for the rejection *34 was that tetracycline was inherently coproduced with Aureomycin in the practice of Duggar and Niedercorn patents, and was unpatentable over Aureomycin. He required additional experiments to prove or disprove the basis for his rejection.
Hutz, who was Pfizer's patent attorney, dictated a memorandum entitled "Notes re Patentability of Tetracycline and Its Hydrochloride Salt Over Duggar and Niedercorn". (GTX 247). He sent the memo to Murphy with a cover letter describing the memorandum as his present thoughts on the patentability of the broad claims. (GTX 202, GTX 247). Hutz wrote in the memorandum that the examiner's rejection was obviously based on the erroneous presumption that substantial proportions of tetracycline were produced by Duggar and Niedercorn. He stated further that mere unrecognized trace amounts serving no useful purpose should not anticipate a claim directed to tetracycline. Pfizer, therefore, argues that in the light of that memo, its patent counsel assumed that Lidoff was interested not in any small amount of tetracycline contained in the Duggar and Niedercorn processes, but was interested in appreciable amounts. Hutz and Murphy met with Lidoff on November 29, 1954 and used the memo of Hutz as the basis for their presentation. During the meeting, the word appreciable was used by Lidoff. Both Hutz (Hutz, FTC 3893) and Murphy (Murphy Tr. 2007-10, 2904) testified that Lidoff seemed to understand the term appreciable to mean more than identifiable, that he was not interested in the coproduction of small amounts, but that he was concerned about the possibility that Duggar and Niedercorn produced substantial portions of tetracycline.
After the meeting with Lidoff on November 29, 1954, Hutz and Murphy filed an amendment to the patent application which stated:
"While applicant's counsel did not concede that there is any necessity for such a showing [the non-existence of tetracycline `in a clearly identifiable form according to present-day efficient methods for the separation thereof from fermentation broth'], he ventured the opinion that it could be made and stated that he would explore the matter in view of the great urgency of this case. The Examiner made it clear that he would not insist on a categorical averment that the fermentation broths prepared according to cited patents contained no tetracycline whatsoever. He evidently appreciates the impossibility of proving its non-existence and is not concerned about useless trace amounts which cannot be separated from the broths by methods now recommended for recovery of the new antibiotic."
Rule 2 of the Patent Office specifies that all business with that Office must be transacted in writing, and that the actions of the Patent Office will be based exclusively on the written record. Where interviews are held such as the ones on November 29, and December 8, 1954, among Lidoff, Hutz and Murphy, a complete written statement of the reasons presented at the interview as warranting favorable action must be filed by the applicant. Hutz filed detailed summaries or "Remarks" concerning interviews he and Murphy had with Lidoff on November 29, and December 8, 1954, which became part of the permanent written record of the Conover application. Written amendments and supporting affidavits were filed with Lidoff by Hutz and Murphy. To assure the accuracy of the record, Lidoff was obligated, under Patent Office practices, to correct misstatements in the submissions, or to require Pfizer's counsel to make such corrections. Lidoff's failure to indicate any disagreement with the statements can only mean that he accepted them as accurate. The "Remarks" cannot be contradicted by later testimony or by an attempted reconstruction of the proceedings. As the Supreme Court observed in United States v. United States Gypsum Co., 333 U.S. 364, 395-96, 68 S.Ct. 525, 542, 93 L.Ed. 746 (1948):
"Where such [oral] testimony is in conflict with contemporaneous documents we can give it little weight, particularly when the crucial issues involve mixed questions of law and fact."
*35 The government relies on the testimony of Lidoff given in 1966 at the FTC proceedings and in 1972 in a deposition in this case, where he attempts to reconstruct his state of mind in 1954 during the proceedings for the Conover patent. We cannot accept such testimony as credible evidence. Such evidence cannot constitute the clear, unequivocal and convincing evidence which a charge of fraud requires.
Lidoff has testified that he would have been interested in whether any amount of tetracycline was found in the Aureomycin broth. Pfizer's representatives have testified that this was not their understanding, and both their testimony and their summary of their interview with Lidoff filed as an amendment, supports their contention. The crux of the matter is what Hutz and Murphy believed Lidoff wanted. Lidoff has testified:
"It is utterly impossible for me to remember any statements that I actually made at the interview ...
As I have prefaced all my remarks, everything I have said is based on reconstruction, based upon what I think, what I thought the principles of patentability were."
(Tr., Vol. 28, p. 3755)
The law is clear that to establish fraud on the Patent Office a specific fraudulent intent must be shown; good faith is a complete defense and a mere "technical fraud" or honest mistake will not suffice. Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965); Bendix Corp. v. Balax, Inc., 421 F.2d 809, 810 (7th Cir. 1970), cert. denied, 399 U.S. 911, 90 S.Ct. 2203, 26 L.Ed.2d 562 (1970). The government had the burden to prove that Murphy and Hutz not only withheld or misstated material information, but that they did so with the specific intent to defraud the Patent Office. The government has failed to prove the fraudulent intent. Even Lidoff, who testified some twelve years after the events concerning the Conover application, agreed that Hutz and Murphy gave him the information they believed he wanted. When Lidoff was asked at the FTC hearing whether he considered Hutz and Murphy gave him what they understood he was interested in, he replied:
"Apparently so. I have no reason to believe otherwise." (FTC Tr. 11601-02).
Since we have found that the government has failed to prove fraudulent intent, we are not obligated to review the testimony as to materiality, but we shall. The government had the burden to prove that any alleged misrepresentations or non-disclosures involved facts material to the issuance of the Conover patent.
"The misrepresentation must be material that is, it must be shown that the patent would not have issued but for the misrepresentation." Mueller Brass Co. v. Reading Industries, Inc., 352 F.Supp. 1357, 1371 (E.D.Pa.1972), affirmed 487 F.2d 1395 (3rd Cir. 1973).
The government has contended that information that small amounts of tetracycline may have been coproduced under the prior art Duggar and Niedercorn processes was withheld from the Patent Office because it would have barred issuance of the Conover patent. That contention is incorrect. Coproduction of small amounts of tetracycline in the prior art which was unrecognized at the time of the Conover invention could not act as a bar to a patent on tetracycline. Two courts which have considered the Conover patent's validity have held it to be valid despite coproduction. North Carolina v. Pfizer, 384 F.Supp. 265 (E.D.N.C.1974); Chas. Pfizer & Co. v. Barry-Martin Pharmaceuticals, Inc., 241 F.Supp. 191 (S.D.Fla.1965).
In Chas. Pfizer & Co. v. Barry Martin Pharmaceuticals, Inc., supra, the court held the Conover patent valid stating:
"The prior existence of tetracycline in Aureomycin in trace amounts, unrecognized and of no use does not invalidate the patent. Kuehmsted v. Farbenfabriken of Elberfeld Co., 179 F. 701 (7th Cir., 1910); Parke-Davis & Co. v. H. K. Mulford Co., 189 F. 95 (S.D.N.Y., 1911); aff'd 196 F. 496 (2nd Cir., 1912); Merck & Co. v. Olin Mathieson Chemical Corp., 253 *36 F.2d 156 (4th Cir., 1958)." 241 F.Supp. at 194.
In the case of North Carolina v. Chas. Pfizer & Co., Inc., supra, that court held that:
"Four patent experts, including one called by the plaintiff, and several patent attorneys testified that the prior accidental and unrecognized co-production of small amounts of tetracycline with Aureomycin did not render the claim to tetracycline unpatentable. A review of their testimony and the applicable law ... [has] served to establish to the satisfaction of this court the proposition that `novelty is not negatived by any prior accidental occurrence or production, the character and function of which was not recognized until later than the date of the patented invention sought to be anticipated thereby.' 1 Walker, Patents, 6th Ed., § 106, and that Lidoff was indeed wrong." 384 F.Supp. at 278 n.17.
There have been many other adjudications which have confirmed the basic principle that prior unrecognized coproduction or use will not bar a patent on a later invention of the same product or process.[14]
In Ritter v. Rohm & Haas Co., 271 F.Supp. 313 (S.D.N.Y.1967), the court stated at page 345 that where products are unwittingly produced, while the operators are in pursuit of other and different results, without exciting attention and without its even being known what was done or how it has been done, it would be absurd to hold that this is anticipation. The court went on to say:
"It is one thing to say a rose by any other name is still a rose. It is far different to assert that the discovery of a rose means discovery of a bee which happens, incidentally, to be lost in its petals." 271 F.Supp. at 346.
Defendant, Pfizer, contends that tetracycline is the "bee" in the AUREOMYCIN "rose". They claim that prior to Conover's invention of tetracycline in 1952, there was not so much as a buzz to indicate the existence, the structure, or any of the distinctive therapeutic benefits of the tetracycline that may have existed, latent and unrecognized, in Aureomycin broths and commercial products. No evidence has been presented to this Court that anyone prior to the Conover invention had any knowledge of the therapeutic benefits of tetracycline.
Thus, after carefully reviewing the voluminous notes of testimony and the numerous exhibits offered in evidence, we conclude that as to Count I, the government has failed to prove that the issuance of the Conover patent on January 11, 1955 was the result of a fraud perpetrated on the Patent Office by defendant Pfizer, Inc. by intentionally making false and misleading statements to the Patent Office, while suppressing and withholding material and relevant information. Accordingly, we shall enter judgment on Count I in favor of the defendants and against the plaintiff.
Count II has already been dismissed.[15]
As to Count III, the Court shall hold an evidentiary hearing to determine if the parties wish to proceed on the remaining claim.
NOTES
[1] U.S. Patent No. 2,699,054.
[2] This count was dismissed by the United States District Court for the District of Minnesota on October 29, 1976. The Court of Appeals for the Eighth Circuit affirmed the dismissal on August 5, 1977, holding that "a mere purchaser of the product from the patentee has no private cause of action for fraud on the Patent Office ..." United States v. Pfizer, Inc., 560 F.2d 323, 326 (8th Cir. 1977). No appeal was taken.
[3] The defendants' motions for partial summary judgment have twice been denied by this Court, the motions being based upon the Illinois Brick and Midwest Paper cases which dealt with anti trust liability to indirect purchasers.
[4] Section 4A of the Clayton Act, 15 U.S.C. § 15a provides:

"Whenever the United States is hereafter injured in its business or property by reason of anything forbidden in the antitrust laws it may sue therefor in the United States district court for the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover actual damages by it sustained and the cost of suit."
[5] Antibiotics are chemical substances produced by certain microorganisms. They have the capacity to destroy and inhibit the growth of infections and disease producing microorganisms.
[6] U.S. Patent No. 2,482,055.
[7] U.S. Patent No. 2,609,329.
[8] U.S. Patent No. 2,516,080.
[9] An "interference", under Patent Office rules, is a proceeding conducted to determine the priority of invention between two or more applicants claiming the same patentable invention. Patent Office Rule 201(a); C.F.R. 1.201(a).
[10] Coproduction is the production of more than one antibiotic product during a single fermentation process.
[11] Prior art in patent law is information accessible to the public as of the date of the claim invention. Thus the Duggar patent which was issued on September 13, 1949, and the Niedercorn patent which was issued on September 2, 1952, were prior art with respect to tetracycline which Conover invented in June 1952.
[12] These were the same grounds covered by the FTC complaint.
[13] The motions were made on January 18, 1974, May 30, 1974, and August 25, 1975.
[14] Tilghman v. Proctor, 102 U.S. 707, 26 L.Ed. 279 (1881);

Silvestri v. Grant, 496 F.2d 593 (D.C.Pa.1974), cert. denied, 420 U.S. 928, 95 S.Ct. 1126, 43 L.Ed.2d 399 (1975).
Georgia Pacific Corp. v. United States Plywood Corp., 258 F.2d 124 (2d Cir. 1958), cert. denied, 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958);
Reynolds Metals Co. v. Aluminum Co. of America, 457 F.Supp. 482, 505, 507 (N.D.Ind.1978); Ritter v. Rohm & Haas Company, 271 F.Supp. 313 (S.D.N.Y.1967);
International Nickel Company, Inc. v. Ford Motor Company, 166 F.Supp. 551 (S.D.N.Y.1958).
[15] See footnote 2 of this Opinion.