[redacted]

**In re COORDINATED PRETRIAL PROCEEDINGS IN ANTIBIOTIC ANTITRUST ACTIONS.**

**Appeal of UNITED STATES of America.**

**UNITED STATES of America, Appellant,**

**v.**

**PFIZER INC., American Cyanamid Company, Bristol-Myers Company, Olin Corporation, Squibb, Inc., E. R. Squibb & Sons, Inc., and The Upjohn Company.**

**Nos. 81-1067, 81-1068.**

United States Court of Appeals, Third Circuit.

Argued Feb. 1, 1982.

Decided Feb. 16, 1982.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

Richard J. Favretto, Deputy Asst. Atty. Gen., Barry Grossman, Marion L. Jetton (argued), Attys., Dept. of Justice, Washington, D. C., for appellant; Paul A. Owens, Edward S. Panek, Jr., Attys., Dept. of Justice, Washington, D. C., of counsel.

Joseph A. Tate, George E. Rahn, Jr., David G. Battis, Philadelphia, Pa., Robert E. Cooper (argued), James P. Clark, Los Angeles, Cal., Thomas H. Shiah, Minneapolis, Minn., for appellee, Pfizer Inc.; Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., Gibson, Dunn & Crutcher, Los Angeles, Cal., of counsel.

Richard A. Horgan, Stuart M. Reynolds, Jr., Winthrop, Stimson, Putnam & Roberts, Henry J. Zafian, Fish & Neave, New York City, for appellee, Bristol-Myers Co.

Allen F. Maulsby, Cravath, Swaine & Moore, New York City, for appellees, Ohn Corp., Squibb, Inc., and E. R. Squibb and Sons, Inc.

Charles E. Buffon, Covington & Burling, Washington, D. C., for appellee, The Upjohn Co.

Samuel W. Murphy, Jr. (argued), Kenneth N. Hart, William J. T. Brown, Kenneth E. Newman, Eric J. Lobenfeld, Andrew J. Miller, Donovan, Leisure, Newton & Irvine, New York City, F. Hastings Griffin, Jr., Dechert, Price & Rhoads, Philadelphia, Pa., for appellee, American Cyanamid Co.

K. Robert Conrad, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for appellees, Bristol-Myers Co., Olin Corp., Squibb, Inc., E. R. Squibb and Sons, Inc., and The Upjohn Co.

Before GIBBONS, WEIS and GARTH, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge:

The United States appeals from a judgment in favor of defendants Pfizer, Inc. (Pfizer), American Cyanamid Co. (Cyanamid), Bristol-Myers Co. (Bristol), Olin Corporation (Olin), Squibb, Inc., E. R. Squibb & Sons, Inc. (collectively Squibb), and The Upjohn Company (Upjohn), in a multicount suit to cancel the Conover patent[1] held by Pfizer on the antibiotic drug tetracycline and for civil damages under Section 4A of the Clayton Act. We conclude that the District Court's findings were not clearly erroneous and we affirm.[2]

Tetracycline is a broad spectrum antibiotic[3], part of a generation of drugs that became available to the public shortly after the second world war. The first broad spectrum antibiotic, chlortetracycline, was discovered by Dr. Duggar and introduced in 1948 by Cyanamid under the name Aureomycin. An improved fermentation process was subsequently patented by Cyanamid—the Niedercorn process.

Pfizer's Dr. Conover, in June 1952, was able to produce tetracycline by dischlorinating Aureomycin—i.e. by substituting hydrogen for chlorine in chlortetracycline. On October 23, 1952 Pfizer applied for a patent on tetracycline and on the Conover process. On March 2, 1954, the Patent Office declared an "interference"[4] involving Pfizer's Conover, Cyanamid's Minieri and Bristol's Heinemann applications, the latter two having been filed after Pfizer's application. On October 14, 1954, Hearing Examiner Lidoff, finding that tetracycline was not patentable, dissolved the interference. It appeared to Lidoff that tetracycline might have been produced by the prior art processes taught by Duggar and Niedercorn; the coproduction of tetracycline with Aureomycin might, therefore, deny Conover's invention the novelty prerequisite for obtaining a patent. The Conover application was formally rejected.

On November 29, 1954, Pfizer's representatives Werner H. Hutz and Dr. Francis X. Murphy met with Examiner Lidoff to discuss his decision.[5] At that meeting Pfizer made representations about the amount of tetracycline produced in processes used to manufacture Aureomycin. Lidoff, in turn, indicated his concerns about the patentability of tetracycline.[6] Examiner Lidoff indi-

---

1. U.S. Patent No. 2,699,054.

2. The District Court decision on Count I appears at 498 F.Supp. 28 (E.D.Pa.1980).

3. The "broad spectrum" nomenclature is used to indicate a wide range of effectiveness against many types of microbes.

4. An earlier interference was declared between the Pfizer and the Cyanamid (Boothe-Morton) applications. This interference proceeding was ended when, pursuant to an offer of proof between the two companies, Cyanamid conceded

priority to Pfizer and obtained from it a license to produce tetracycline. *See In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 498 F.Supp. 28, 31 (E.D.Pa.1980).

5. The discussion at this meeting is summarized in "Remarks" prepared by the Pfizer representatives. (App. 2:369–75, 390–91).

6. There is no claim that the Conover process for manufacturing tetracycline, as distinguished from that product, is not patentable.

cated that he would consider further evidence of tetracycline coproduction with Aureomycin. He discussed the type of evidence that would dispell his doubts. Pursuant to this meeting, Pfizer conducted tests to check coproduction and presented the results of those tests to Examiner Lidoff in the form of affidavits by Drs. Bogert and Tanner. (App. 2:376–88, 392–95).

Lidoff, on the basis of Pfizer's representations, allowed the Conover patent application on December 9, 1954. The patent issued January 11, 1955 and Cyanamid was licensed thereunder. Shortly thereafter, Pfizer sued Bristol, Squibb and Upjohn for patent infringement. That litigation ended in a settlement whereby Pfizer licensed Bristol to make, use and sell tetracycline; Squibb and Upjohn each received a license to use and to sell tetracycline. These licensees, in turn, dropped their challenge to the validity of the Conover patent.

The present action[7] was brought in 1969 by the United States on a three count complaint against Pfizer, Cyanamid, Bristol, Olin, Squibb and Upjohn.[8] Count I seeks to cancel Pfizer's Conover patent on tetracycline, alleging that its issue was effected through fraud on the Patent Office. It is the Government's position that Pfizer made false and misleading representations and omissions to the Patent Office, specifically to Examiner Lidoff. Count II, which states a common law claim for deceit, was dis-

missed earlier and is not before us.[9] Count III is an antitrust civil damages claim under Section 4A of the antitrust civil damages claim under Section 4A of the Clayton Act alleging that the defendants conspired to restrain trade in the broad spectrum antibiotics market in violation of the Sherman Act. Defendants allegedly used the fraudulently obtained Conover patent to foreclose competition. The Government seeks damages of $100,000,000 it allegedly incurred by paying artificially high non-competitive prices for tetracycline either as purchaser of drugs or as reimburser of the cost of purchases by others.

Count I was tried without a jury in the Eastern District of Pennsylvania. The District Court determined that Pfizer's dealings with the Patent Office were not tainted by a fraudulent intent and refused to cancel the Conover patent.

Considering all the evidence, the court found that the Government had not discharged its burden of proving by clear and convincing evidence that Pfizer's representatives—Hutz and Murphy—had a specific intent to defraud the Patent Office.[10] The District Court, therefore, entered judgment on August 18, 1980 against the United States on Count I. On October 10, 1980 a final judgment in favor of all defendants on Count III of the Government's complaint was entered.[11]

---

7. The Conover patent has also spawned an FTC unfair practice proceeding against Pfizer, Cyanamid, Bristol, Squibb and Upjohn for providing false, misleading and incorrect information to the Patent Office, *Charles Pfizer & Co. v. FTC*, 401 F.2d 574 (6th Cir. 1968), *cert. denied*, 394 U.S. 920, 89 S.Ct. 1195, 22 L.Ed.2d 453 (1969), and a Justice Department criminal suit against Pfizer, Cyanamid and Bristol charging violation of the antitrust laws. *United States v. Charles Pfizer & Co.*, 426 F.2d 32 (2d Cir. 1970), *aff'd*, 404 U.S. 548, 92 S.Ct. 731, 30 L.Ed.2d 721 (1972).

8. This action was originally filed in the District of Columbia. It reached the Eastern District of Pennsylvania via a circuitous path not relevant to our purposes.

9. *United States v. Pfizer & Co.*, 560 F.2d 323, 326 (8th Cir. 1977).

10. The District Court decided in the alternative that, even if fraudulent intent were shown, the result would be unchanged because the alleged misrepresentations and omissions were not material and would not warrant cancelling the patent. 498 F.Supp. at 35. We do not pass on this alternate holding since we affirm on the basis that Pfizer did not defraud the Patent Office.

11. The trial judge indicated that his judgment on Count III in favor of all defendants other than Pfizer was based on his alternative holding of non-materiality in his August 18, 1980 opinion. We do not need to reach that alternate holding since we deem the Conover patent valid on the basis that no fraud was committed against the Patent Office. The resulting monopoly is therefore proper under the antitrust laws and defendants can not be held liable for any anticompetitive effects resulting from the Pfizer patent. The Government conceded, pri-

On this appeal, the United States asserts that the District Court committed clear error in finding that Pfizer thought Examiner Lidoff was interested in evidence only of "substantial" tetracycline coproduction in Aureomycin fermentation processes. It urges that Pfizer knew that Lidoff was interested in evidence of any amount of tetracycline production by pre-existing processes and that Pfizer acted with fraudulent intent in not telling Lidoff that its affidavit tests and prior research had indicated some tetracycline coproduction by the Duggar and Niedercorn processes. The Government also asserts that the District Court ignored evidence which independently established Pfizer's alleged fraudulent intent. The nub of this contention is that the court's opinion did not specifically consider and discuss evidence favorable to the Government. We find the appellant's position without merit.

 The Government does not contend that the District Court applied the wrong legal standard in determining what kind of evidence will support a charge of fraud. We only review, therefore, the court's factual finding that Pfizer had no fraudulent intent and our task is restricted to a determination of whether those findings are clearly erroneous. *See Jackson v. United States Steel Corp.,* 624 F.2d 436 (3d Cir. 1980); *Krasnov v. Dinan,* 465 F.2d 1298 (3d Cir. 1972). This standard of review does not permit an appellate court to substitute its findings for those of the trial court. It allows only an assessment of whether there is enough evidence on the record to support those findings. That a different set of inferences could be drawn from the record is not determinative. It is sufficient that the District Court findings of fact could be reasonably inferred from the entire trial record.

The findings of fact are not clearly erroneous. The trial judge credited the testimony of witnesses Hutz and Murphy. 498 F.Supp. at 34. These are credibility deter-

minations well within the ambit of the court's competence. Dr. Murphy testified for ten days and the court had ample opportunity to observe his demeanor. Hutz testified shortly after the 1955 patent issued in the Bristol infringement suit and in the FTC proceedings, when the relevant events were fresh in his mind. Hutz stated:

Mr. Lidoff indicated that he was not fully satisfied because he wanted to know whether if one followed the disclosures of the two patents, Duggar and Niedercorn, one could get these substantial amounts or concentrations of tetracycline which would make it possible for the recovery of a therapeutic product. He indicated that even though it were unrecognized, if it were true that you get a large proportion of tetracycline along with the Aureomycin and the effect of those earlier patents were [sic] that the products were antibiotics and people used them that way, that whether they knew it or not they would have the benefits of the tetracycline and he felt that he certainly wanted to have information as to just what occurred.

(App. 10:3611)

He also testified:

The examiner [Lidoff] was interested in whatever practical, appreciable, substantial, useful quantities were in there, and he, for purposes of demonstration, said, "Well, let's apply efficient present-day recovery procedures designed for the purpose of taking it out, not some elaborate detection device that would pick up a useless trace, but things that the art could apply to a broth and in a practical manner get tetracycline out of it." That was his yardstick as to whether appreciable amounts were there, useful amounts.

(App. 10:3705)

Murphy in turn testified that Lidoff was interested in more than identifiable coproduction of tetracycline (App. 20:7445–50, 7451–52, 7486–87), and that Lidoff was "focusing on the possibility that Duggar and

---

or to the entry of the judgment dismissing Count III that it could not prove that count

given the court's decision on Count I.

Niedercorn [Aureomycin processes] produced substantial proportions of tetracycline." (App. 20:7431). Murphy testified that reference to recoverable or appreciable amounts of tetracycline meant "considerable, a good deal, a substantial amount." (App. 20:7485, 7509).

These witnesses' statements regarding Lidoff's actions and Pfizer's representatives' own state of mind were supported by an internal company memorandum [12] from Hutz to Murphy analyzing the Examiner's grounds for rejecting the tetracycline product claim. In that memorandum, Hutz indicated that he believed Lidoff's concerns did not stem from the possible coproduction of small quantities of tetracycline that had gone unrecognized in the prior art, but were based instead on the presumption that substantial proportions of tetracycline were produced by the Duggar and Niedercorn (Aureomycin) process. Hutz' memorandum is of special importance in its own right because it formed the basis for Pfizer's presentations to Examiner Lidoff and there is no indication that Lidoff did anything to change Hutz' and Murphy's understanding of what was required of Pfizer. (App. 20:7445–48, 7451–52).

█ The District Court also relied on the written record before the Patent Office concerning the Conover patent. In addition to the original application, this record contains written amendments and supporting affidavits (App. 2:368–69, 371–88; 392–95), as well as detailed summaries (the "Remarks") of meetings that Pfizer's representatives had with Examiner Lidoff. These amendments and additions, although submitted by Pfizer, became part of the record on which the Patent Office was required to rely exclusively in determining patentability. Examiner Lidoff was obligated to correct any misstatements or omissions, and since he took no such action, a

presumption of accuracy attaches to the Remarks and amendments. The District Court properly held that the Remarks and amendments could not be contradicted by later testimony or by an attempted reconstruction of the earlier proceedings. 498 F.Supp. at 34; *see generally, United States v. United States Gypsum Co.*, 333 U.S. 364, 395–96, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). The Remarks indicate that Lidoff was interested in appreciable [13] coproduction and not in the coproduction of small amounts of tetracycline (App. 2:369–70, 372, 374). Moreover, Lidoff did not ask nor expect Pfizer to conduct an elaborate research program in order to establish the existence of "trace" amounts of tetracycline that might be produced by prior art Aureomycin processes (App. 2:374). The Remarks also show that Pfizer's representatives informed Lidoff of their fruitless attempts to discover appreciable amounts of tetracycline (App. 2:374, 377, 383, 393).

The centerpiece of the Government's case was the testimony of Examiner Lidoff that he had been troubled by the coproduction of any amount of tetracycline with Aureomycin and that he would not have granted the patent had he been aware that any tetracycline was produced by the Duggar and Niedercorn methods. The evidence consisted of Lidoff's testimony given in 1966 before the FTC and of a 1972 deposition in this action. The passage of at least eleven years from the relevant facts in itself casts some doubt on the credibility of Lidoff's uncredited testimony, but there is a more fatal flaw. Lidoff indicated that it was impossible for him to recollect the actual events that transpired in 1954, and he could only attempt, therefore, to recreate his frame of mind in that year. (App. 10:3442, 3502, 3518, 3456, 3481–82). Lidoff's testimony is a *post hoc* reconstruction of what his position on the patentability of tetracycline would have been in 1954 based upon a

---

**12.** "Note re Patentability of Tetracycline and its Hydrochloride Salt over Duggar and Niedercorn" (App. 4:1331).

**13.** Although the term "appreciable" may be open to various interpretations and the Government wishes us to read "appreciable" to mean

"identifiable by research techniques," Hutz' and Murphy's testimony, credited by the court, suggest that "appreciable" was meant to be read as "substantial." (App. 2:369–75; 20:74859–87).

**56**

reconstruction of his then current views on the general principles of patentability. This sort of evidence is quite indirect and removed from the underlying facts. The district judge refused to credit Lidoff's testimony and we cannot say he committed clear error.

██ In light of the Hutz and Murphy testimony, of the written record before the Patent Office in 1954, and of the rejection of Examiner Lidoff's testimony, the District Court's finding that Pfizer had no specific intent to defraud the Patent Office is not clearly erroneous.

The Government contends that Pfizer, in checking for the tetracycline coproduction at the behest of Examiner Lidoff, performed tests which it knew could not yield tetracycline.[14] Moreover, the Government alleges that the tests were not properly run, that ineffective recovery and identification techniques were employed, and that properly conducted tests would have produced quite different results. (See Brief of Appellant pp. 46–47). The Government also alleges that Pfizer acted recklessly in failing to determine what exactly Examiner Lidoff wanted, and that Pfizer should have reported whatever information it had on the coproduction of tetracycline to Examiner Lidoff and let him decide whether he deemed the discovered amounts substantial. Even assuming *arguendo* that specific intent required for fraud can be deduced from a reckless disregard for the truthfulness of information supplied to the Patent Office, there is no indication that Pfizer acted recklessly. Pfizer had no duty to deluge the Patent Office with data that was neither necessary nor requested. There is no evidence that Pfizer was aware of a possible difference in opinion between itself and Examiner Lidoff concerning the

basis for the initial rejection of the Conover patent. Pfizer cannot be faulted for not resolving a difference that it did not know existed. In advancing these contentions the Government shows the trial record contains evidence pointing in an opposite direction from the trial court's findings. What the argument establishes is that the findings were based on conflicting evidence. But a trier of fact faced with conflicting evidence must, of necessity, reject some of it. The Government cannot prevail under the clearly erroneous standard merely by exhibiting parts of the record which the trial court rejected.

The judgment appealed from will be affirmed.

14. Some of the Government's contentions are based on the alleged fact that Pfizer knew of the production of some tetracycline with Aureomycin (even in commercial batches) and that it was able to recover and identify that tetracycline using laboratory research techniques. The Government would have fraudulent intent bootstrapped on Pfizer's not making such information available to the Patent Office. That position is without merit. The trial court decided that Pfizer believed that Examiner Lidoff was interested in the existence of substantial amounts of tetracycline—recoverable by the current commercial recovery techniques—by prior art processes. Information as to small tetracycline amounts recoverable by laboratory methods was not requested, and Pfizer cannot be held to have acted improperly in withholding unnecessary information from the Patent Office.